O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| KENNETH L. PUCKETT, | )    Case No. SACV 07-00036-MLG |
| Plaintiff, | )    MEMORANDUM OPINION AND ORDER |
| v. | ) |
| MICHAEL J. ASTRUE,<br>Commissioner of the Social<br>Security Administration, | ) |
| Defendant. | ) |

Plaintiff Kenneth L. Puckett seeks judicial review of the Commissioner's denial of his application for Disability Insurance benefits under the Social Security Act. For the reasons stated below, this case is remanded for an award of benefits.

**I. Facts and Procedural History**

Plaintiff was born on February 15, 1961, and is currently 46 years old. He completed the eleventh grade, then later obtained a GED. (Administrative Record ("AR") 60, 97.) Plaintiff's work history includes positions as a security guard and an apprentice electrician. (AR 92.) He also served in the military for thirteen years.

**A. The Accident**

Plaintiff has not been gainfully employed since September 23, 1998, when he was electrocuted by a live wire while he was working, falling fifteen feet from a ladder and losing consciousness. (AR 16.) Plaintiff was hospitalized, suffering from severe head trauma and third degree burns on his left hand that required skin grafts (AR 136, 186.) Plaintiff experienced retrograde amnesia for the 24-hour period before the accident and anterograde amnesia for approximately two weeks afterward. (AR 203.)

Plaintiff remained hospitalized until October 12, 1998, when he was admitted to the Winways Residential Rehabilitation Program for occupational, speech, and physical therapies. (AR 186.) At that time, Plaintiff complained of headaches, dizziness, sleep impairment, vision problems, including double vision and blurring, back pain, anxiety and depression regarding the accident, and cognitive impairment. Plaintiff's treating physician at Winways, Dr. Adams, prescribed Paxil, Daypro, Serzone, Ambien, Ultram, and BuSpar to address Plaintiff's symptoms. (AR 206.) On October 22, 1998, Dr. Adams concluded that Plaintiff was temporarily totally disabled.

Plaintiff was discharged from Winways on March 29, 1999, though he continued to complain of headaches, dizziness, anxiety, depression, sleeplessness, double vision, and back pain. He continued to see Dr. Adams after his discharge. Plaintiff also received vision therapy from Dr. Ikeda and mental health counseling from Dr. Ingalls.

At some point in the spring of 1999, Plaintiff attempted to complete a vocational retraining course, but headaches, dizziness, and difficulty concentrating caused him to drop the course. (AR 41, 360.)
//

### B. The Disability Claim

Plaintiff filed an application for Social Security disability benefits on June 1, 1999,[1] which the Commissioner denied on August 20, 1999. (AR 63, 78.) After Plaintiff requested reconsideration of the decision, the Commissioner again denied Plaintiff's application on January 13, 2000. (AR 68-74.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 28, 2000. (AR 15, 72.) The ALJ determined that Plaintiff was capable of performing light work and, accordingly, was not disabled as defined by the Social Security Act. (AR 20.) On March 29, 2002, the Appeals Council denied Plaintiff's request for review.

Plaintiff filed an action for judicial review in this Court on May 23, 2002. (*Kenneth L. Puckett v. Jo Anne B. Barnhart*, Case No. SACV 02-500-MLG.) On January 7, 2003, upon the parties' stipulation, the Court vacated the ALJ's decision and remanded the case to the Commissioner for further proceedings, in light of a new treating physician's opinion. In accordance with the Court's order, the Appeals Council remanded the case to a different ALJ on February 18, 2004. (AR 539.) Plaintiff appeared for the second hearing on August 25, 2004. The ALJ denied Plaintiff's application on December 9, 2004, concluding that Plaintiff had a Residual Functional Capacity ("RFC") to perform a limited range of medium exertion work, which was "not significantly reduced by nonexertional limitations." (AR 530.) Plaintiff filed objections to the ALJ's decision, and, on March 2, 2005, the Appeals Council remanded the case to yet another ALJ for a third hearing, which was held on October 27, 2005. The third ALJ denied Plaintiff's application on July 20, 2006,

---

[1] The ALJ states that Plaintiff filed his claim on May 18, 1999, but the application itself is dated June 1, 1999.

3

after determining that Plaintiff was capable of performing a limited range of medium work and could return to his past relevant work as a security guard. (AR 7-9.) Plaintiff then filed the instant action on January 18, 2007, alleging (1) that the ALJ's determination of Plaintiff's RFC was not supported by substantial evidence; (2)that the ALJ failed to properly weigh the treating physicians' opinions; (3) that the ALJ improperly discounted Plaintiff's credibility; and (4) that the ALJ's conclusion that Plaintiff could work as a security guard was not supported by substantial evidence. (Joint Stipulation ("Joint Stip.") 7-8.)

The Court notes that Plaintiff's disability insured status expired on December 31, 2000, according to the Commissioner. (AR 544-45.) Plaintiff disputes that this date is correct, but provides no evidence that it is not. (*See* Joint Stip. 11.) The Court will assume for purposes of this opinion that the Commissioner correctly identified Plaintiff's date last insured.[2]

**C. The Treating Physicians' Opinions**

On April 23, 1999, in a progress evaluation, Dr. Ikeda opined that Plaintiff suffered from convergence insufficiency, fusional instability, oculomotor dysfunction, and accommodative dysfunction. (AR 216.) He noted that patients experiencing these dysfunctions often complain of eye pain, headaches, dizziness, and blurred vision. (*Id.*) Dr. Ikeda prescribed tinted prescription lenses for Plaintiff to wear while driving, working on the computer, or reading, to help alleviate his symptoms.

---

[2] Plaintiff must demonstrate that he was disabled on or before his date last insured in order to obtain Social Security benefits. *See Tidwell v. Apfel*, 161 F.3d 599, 600 (9th Cir. 1998).

4

Dr. Ingalls, a licensed clinical psychologist, stated in his April 16, 1999, report that Plaintiff suffered from several cognitive deficiencies and psychosocial stressors, including neurophysical and neurobehavioral complaints, chronic pain, uncertainty as to future employability, and feelings of hopelessness. (AR 235.) Dr. Ingalls concluded that Plaintiff had "reached a level of moderate disability on the Glasgow Outcome Scale," meaning "[i]ndependent but disabled." (AR 236.) Dr. Ingalls did not foresee that Plaintiff's neuropsychological impairments would cause permanent disability, but he noted that "[p]sychological factors of depression and anxiety regarding current physical complaints are currently the primary non medical factors interfering with his ability to pursue vocational retraining at this time. (*Id.*)

Through the summer of 1999, Plaintiff also experienced numbness and tingling in his left hand and arm, which ultimately resulted in left ulnar nerve surgery on November 8, 1999. (AR 310.) Plaintiff reported pain in his left knee, and he continued to complain of headaches, dizziness, light-headedness, back pain, and anxiety. (AR 357-59.)

Dr. Johanna L. Rosenthal served as Plaintiff's primary treating physician from October 15, 1999, to approximately September 15, 2000.[3] In a January 14, 2000, report, Dr. Rosenthal stated that Plaintiff continued to experience cognitive deficits resulting from the accident, that he had left ulnar neuropathy, and that he had occasional double vision, particularly in the left gaze. (AR 311.) Dr. Rosenthal concluded that Plaintiff was temporarily totally disabled. (*Id.*) After a follow up appointment on February 25, 2000, Dr. Rosenthal noted that Plaintiff

---

[3]   Dr. Rosenthal changed her practice at that time, so Plaintiff began seeing Dr. M. Michael Mahdad as his primary treating physician.

5

suffered from depression, headaches, dizziness, and tinnitus, that he could not sleep more than one hour due to pain, and that he was unable to use his left hand after having all necessary surgeries. (AR 304-07.) Dr. Rosenthal also stated that Plaintiff was not "feeling well enough to undergo the [vocational] retraining program," and that he was still temporarily totally disabled. (AR 305-06.) In addition, Dr. Rosenthal concluded that Plaintiff "has a lot of nystagmus with certain positions of gaze. This will limit his job training capabilities, in that, a lot of activities will make him dizzy. He is going to require an occupation where he does not move his head and neck very much." (AR 306.)

In her January 14, 2000, report, Dr. Rosenthal indicated that Plaintiff suffered daily headaches, neck and back pain, diminished memory, borderline left sixth nerve palsy, finger abduction and diminished opponens in the upper left extremity, numbness, double vision in the left gaze. (AR 310-11.) Dr. Rosenthal requested follow-up testing, and she stated that Plaintiff should consider a job retraining program for "a more suitable scaled down occupation."

Dr. Mahdad began treating Plaintiff on September 15, 2000. After Plaintiff's first visit, Dr. Mahdad also concluded that Plaintiff was temporarily totally disabled, due to headaches, dizziness, numbness and pain in his extremities, sleeplessness, anxiety, forgetfulness, depression, back and neck pain. (AR 323-24.) Dr. Mahdad referred Plaintiff to Dr. Curtis, a psychiatrist, and Dr. Styner, an orthopedic surgeon, and he stated that Plaintiff was not able to continue with vocational rehabilitation at that time.

Dr. Styner evaluated Plaintiff on September 29, 2000. (AR 342.) Dr. Styner noted Plaintiff's complaints of depression, headaches, and memory loss. Dr. Styner diagnosed inflammatory process of the left knee and

decreased sensation of the left leg. (AR 344.) Dr. Styner recommended further testing to rule out internal derangement, and he concluded that the "mechanism of the injury described by the patient correlates with the physical findings today. It is felt these findings are related to the injuries described above." (*Id.*)

Dr. Curtis first evaluated Plaintiff on October 9, 2000. Dr. Curtis determined that Plaintiff suffered from post-concussive symptoms, including headaches, dizziness, phobias to bright light and loud noises, depression, faintness, emotional irritability, and loss of balance and temper. (AR 331.) Dr. Curtis further found that Plaintiff suffered diminished cognitive functioning, including defective recall, concentration, attention, and short-term memory, and that his psychological test results were "extremely abnormal." (*Id.*) Dr. Curtis diagnosed Plaintiff with post-traumatic stress disorder with depression and panic attacks, post-concussion syndrome, and "Psychological Factors Affecting Medical Condition (stress-intensified headache, increased post-concussive problems, hair loss, increased neck/shoulder/back muscle tension/pain and balance problems)." (AR 333.)

In addressing Plaintiff's work capabilities, Dr. Curtis found that Plaintiff was "still too beset by pain and disability and still too withdrawn, insecure, fearful and depressed to work at this time. [Plaintiff] will require psychiatric treatment prior to returning to *any* job." (AR 334 (emphasis added).) Dr. Curtis further concluded, "Considering all factors, it would not appear likely that [Plaintiff] would be able to engage in any suitable gainful employment within the foreseeable future." (*Id.*) Dr. Curtis opined that Plaintiff likely suffered from permanent emotional impairment, and he suggested that Plaintiff might be eligible for Social Security benefits at that time.

**D. Non-treating Physicians' Opinions**

    **1. Non-examining Physicians**

On June 22, 1999, the Social Security Administration hired Dr. Wallace to review Plaintiff's medical records and complete a psychological assessment evaluating his claims. (AR 287.) Dr. Wallace found that Plaintiff suffered from memory impairment and depression, but he concluded that Plaintiff's functional limitations arising from his impairments were relatively minimal. (AR 289-97.) Dr. Wallace opined that Plaintiff had "adequate memory, understanding and concentration to perform simple repetitive tasks in situations [with] minimal social interaction." (AR 298.)

    **2. Examining Physicians**

On December 1, 1999, Dr. Jamshid Tamiry undertook an internal medicine assessment of Plaintiff's alleged disability, at the Social Security Administration's request. Dr. Tamiry indicated that Plaintiff's chief complaints included "[b]urn trauma to the left upper extremity" and "neck pain." (AR 249.) Dr. Tamiry stated that Plaintiff's "physical examination revealed surgical scars, limited range of motion, diminished grip strength and sensation...." (AR 253.) Dr. Tamiry opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, that standing and walking were limited to six hours, that sitting was limited to six hours cumulatively, and that Plaintiff should avoid vibration exposure, crawling and crouching. (*Id.*)

The Social Security Administration also hired Dr. Halimah McGee to complete a psychological evaluation of Plaintiff. During the examination, Dr. McGee administered several psychological tests, which revealed mild to marked deficits in Plaintiff's attention and

concentration, as well as in visual memory.[4] (AR 259.) In her subsequent report, dated December 13, 1999, Dr. McGee concluded that Plaintiff would be able to function in a regular job setting without requiring additional behavior controls or heightened supervision or structure, that he would not create a workplace hazard, that he could work with others and follow instructions, and that he could take public transportation to work. (*Id.*) Dr. McGee noted that Plaintiff's "deficits in visual memory and in attention and concentration would limit the types of tasks he is able to learn, retain and perform...." (*Id.*)

**E. The Hearings**[5]

**1. September 28, 2000**

At his first hearing, Plaintiff testified that he experienced difficulty concentrating and suffered from headaches, light sensitivity, dizzy spells, light-headedness, and short-term memory and concentration problems. (AR 41-43.) He further testified that he could only sit for 30-40 minute period, before needing to get up and move around. (*Id.*) Plaintiff indicated that he spent approximately 80 percent of the day lying down, either in bed or in a recliner, because of frequent dizzy spells. (AR 47.) He testified that he was able to complete simple tasks, but that he needed frequent breaks. (AR 48.) Plaintiff indicated that his knee was frequently sore, and that if he stood on his feet for any length of time, the soreness worsened. (AR 52.)

---

[4]   The Court notes that Dr. Curtis and Dr. McGee administered different psychological tests. Dr. McGee administered the Bender-Gestalt, Rorschach, and Trail-Making Tests (Parts A and B), along with the Wechsler Adult Intelligence Scale - Revised and the Wechsler Memory Scale - Revised. (AR 255.) Dr. Curtis administered the Beck Depression Inventory, Beck Scale for Suicide Ideation, Neuroticism Scale Questionnaire, and MMPI-2.

[5]   The record contains transcripts of only the first and third hearings. Accordingly, the Court will limit the discussion to those hearings.

9

The vocational expert testified that there were light, unskilled jobs in the national and local economies that Plaintiff could perform (AR 55-57.) The expert agreed, however, that those jobs would be eliminated if Plaintiff experienced headaches and dizziness after an hour or two on the job that required him to lie down for a period of time. (AR 58.)

### 2. October 27, 2005

At the most recent hearing, the vocational expert testified that sedentary and limited light jobs were available in the local and national economies.[6] (AR 822-23.) Upon questioning, the expert testified that a person generally would not be employable if required to miss work more frequently than once per month for medical appointments. (AR 823.) The expert also indicated that Plaintiff would be precluded from working if he could not work in bright light, or if he needed to lie down in the morning and afternoon for two hours. (AR 825.) When Plaintiff asked the expert whether the jobs would still be available "if the applicant were in a state which Dr. Rosenthal and Dr. Curtis refer to as temporary total disability and unable to go to work at all," the ALJ interjected, conceding that jobs would not be available. (AR 823.)

After the hearing, the ALJ sent interrogatories to the vocational expert, because the ALJ had omitted Plaintiff's cognitive limitations from the hypothetical posed to the expert. The interrogatories included an amended hypothetical incorporating those limitations.[7] The expert

---

[6]    It appears that there were technical difficulties during the hearing, and, if Plaintiff testified, his testimony was not recorded. The transcript includes only the vocational expert's testimony.

[7]    The amended hypothetical added the following language: "The hypothetical individual also has moderate limitations in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; understand and remember detailed instructions; and accept instructions and respond appropriately to criticism from

1  concluded that Plaintiff could perform his past work as a security
2  guard. (AR 549.)

3

4  **II.  Standard of Review**

5       Under 42 U.S.C. § 405(g), a district court may review the
6  Commissioner's decision to deny benefits. The Commissioner's or ALJ's
7  decision must be upheld if it is "supported by 'substantial evidence'
8  and if the proper legal standard was applied." *Mayes v. Massanari*, 276
9  F.3d 453, 458-59 (9th Cir. 2001). Substantial evidence means such
10 evidence as a reasonable person might accept as adequate to support a
11 conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v.*
12 *Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006). It is more than a
13 scintilla, but less than a preponderance. *Robbins v. Soc. Sec. Admin.*,
14 466 F.3d 880, 882 (9th Cir. 2006). To determine whether substantial
15 evidence supports a finding, the reviewing court "must review the
16 administrative record as a whole, weighing both the evidence that
17 supports and the evidence that detracts from the Commissioner's
18 conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1996). "If
19 the evidence can support either affirming or reversing the ALJ's
20 conclusion," the reviewing court "may not substitute [its] judgment for
21 that of the ALJ." *Robbins*, 466 F.3d at 882.

22

23 **III. Discussion**

24      To obtain disability benefits under the Social Security Act, a
25 claimant must establish "the inability to do any substantial gainful
26 activity by reason of any medically determinable physical or mental
27 impairment which can be expected to result in death or which has lasted
28 ────────────────────────
   supervisors." (AR 550.)

11

or can be expected to last for a continuous period of not less than 10 months." 20 C.F.R. § 404.1505(a).

**A. The ALJ Improperly Rejected the Treating Physicians' Opinions in Determining Plaintiff's Residual Functional Capacity.**

The ALJ in this case determined that Plaintiff had an RFC for a limited range of medium work.[8] A claimant's RFC is what she is capable of doing despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1); *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).[9] An RFC assessment is ultimately an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). However, an RFC determination is based on all of the relevant evidence, including the diagnoses, treatment, observations, and opinions of medical sources, such as treating and examining physicians. *Id.*

//

---

[8]   As determined by the ALJ, Plaintiff's RFC includes lifting and/or carrying 25 pounds frequently and 50 pounds occasionally; sitting for 6 hours total in an 8-hour workday; standing and walking for 2 hours each and a total of 4 hours in an 8-hour workday; no pushing and/or pulling heavy weight; no balancing, crouching, or crawling; occasional kneeling, stooping, and climbing ramps and stairs; no limitations in reaching in all directions, handling, fingering, feeling, seeing, hearing, and speaking; in exposure to temperature extremes, noise, dust, vibrations, humidity, wetness, fumes, odors, chemicals, and gases; no dangerous machinery at unprotected heights; moderate limitations in understanding, retaining, and carrying out detailed instructions, in attention and concentration for extended periods, and in responding appropriately to criticisms from supervisors. (AR 496.)

[9]   "The Secretary issues Social Security Rulings to clarify the Secretary's regulations and policy....Although SSRs are not published in the federal register and do not have the force of law, [the Ninth Circuit] nevertheless give[s] deference to the Secretary's interpretation of its regulations." *Bunnell v. Sullivan*, 947 F.2d 341, 346 n.3 (9th Cir. 1991) (en banc).

It is the responsibility of the ALJ to resolve conflicts and ambiguities in the medical record and determine credibility. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1989). Thus, the ALJ determines which medical opinions should be given the most weight in light of the general rule in this circuit that, among the three types of physicians—-(1) treating physicians, i.e., those who treat the claimant; (2) examining physicians, i.e., those who examine but do not treat; and (3) non-examining physicians, i.e., those who neither examine nor treat—-the most weight should be given to the opinion of a treating source. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).

An ALJ should accordingly give deference to a treating medical source's opinion as to the nature and severity of an impairment if it is well supported and not inconsistent with other substantial evidence. SSR 96-2p, 1996 WL 374188, at *1 (S.S.A. July 2, 1996). This is "[b]ecause treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual...." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). Factors the ALJ must consider in weighing the opinion of a treating physician include: (1) length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527(d).

The ALJ may reject the opinion of a treating medical source if the ALJ provides specific and legitimate reasons for doing so that are based on substantial evidence in the record. *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Nevertheless, the

13

1    ALJ need not accept the opinion of any medical source, including a
2    treating medical source, "if that opinion is brief, conclusory, and
3    inadequately supported by clinical findings." *Bayliss*, 427 F.3d at 1216;
4    *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *accord Tonapetyan*
5    *v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). In addition, if the
6    opinion of a non-treating source is based upon independent clinical
7    findings that differ from those of the treating medical source, the
8    opinion of the non-treating source may itself be substantial evidence on
9    which the ALJ may rely. *Andrews*, 53 F.3d at 1041.

10       In reaching his conclusion that Plaintiff was capable of limited
11   medium work, the ALJ gave significant weight to the opinion of Dr.
12   McGee, the examining psychologist the Social Security Administration
13   hired in December 1999. The ALJ rejected Dr. Rosenthal's and Dr. Curtis'
14   opinions, and he omitted any reference to Dr. Mahdad's opinion, for
15   reasons that are unclear.

16       Dr. Rosenthal consistently reported that Plaintiff was "temporarily
17   totally disabled," and, on February 25, 2000, she opined that, in the
18   future, Plaintiff would be limited to an occupation not requiring head
19   or neck movement, due to Plaintiff's dizziness and headaches. (AR 306.)
20   The ALJ did not find that Dr. McGee's opinion contradicted Dr.
21   Rosenthal's opinion. Instead, the ALJ rejected Dr. Rosenthal's opinion
22   because: (1) the term "temporarily totally disabled" is used in the
23   context of workers' compensation claims and is uninformative for
24   purposes of Social Security assessments; and (2) her finding of
25   limitations on head and neck movement was based on Plaintiff's
26   subjective report of dizziness and lightheadedness, which Dr. Rosenthal
27   had not noted in her January 14, 2000, report. In rejecting Dr.
28   Rosenthal's opinion for these reasons, the ALJ erred.

14

1  The ALJ concluded that "Dr. Rosenthal's finding that the claimant
2  was 'temporarily totally disabled' simply meant that the claimant was
3  unable to return to his past work as an electrician," and not that he
4  was disabled under the Social Security Act. (AR 494.) However, the ALJ
5  may not so easily dismiss the treating physician's report, just because
6  she used terminology more relevant to a worker's compensation claim.

7  The ALJ rejected Dr. Rosenthal's February 25, 2000, medical opinion
8  that Plaintiff's future work endeavors would require limited head and
9  neck movement, because he believed this conclusion was based on
10 Plaintiff's subjective complaints, which he indicated Plaintiff had not
11 disclosed during his January 14, 2000, examination. The implication, as
12 the ALJ apparently saw it, was that Plaintiff exaggerated his symptoms
13 during the February 25 exam. The ALJ omits any discussion of Dr.
14 Rosenthal's finding that Plaintiff suffered nystagmus, an eye condition
15 that is known to cause dizziness and vertigo.[10] After noting the
16 condition, Dr. Rosenthal stated, "This will limit his job training
17 capabilities, in that, a lot of activities will make him dizzy." (AR
18 306.) Even if rejecting a treating physician's opinion solely because it
19 is based on subjective symptoms were appropriate, which the Court finds
20 to be questionable, *see Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.
21 1998), the record demonstrates that Dr. Rosenthal's opinion was based on
22 objective medical evidence. Furthermore, Plaintiff's medical records are
23 replete with complaints of headaches and dizziness, beginning shortly
24 after the accident and continuing at least through 2004.[11] The fact that
25 Dr. Rosenthal did not mention these symptoms in a single report is

26
27    [10]  http://www.mayoclinic.com/health/dizziness/DS00435/DSECTION=3
(last accessed on October 10, 2007).

28    [11]  The record contains no medical records beyond 2004.

15

insignificant. Because the ALJ provided no other justification for rejecting Dr. Rosenthal's opinion, he failed to provide specific and legitimate reasons for doing so.

After Dr. Rosenthal changed her practice, Plaintiff began treating with Dr. Mahdad, who completed an initial report on September 15, 2000. (AR 323.) Dr. Mahdad concluded that Plaintiff was temporarily totally disabled and unable to continue with vocational rehabilitation due to his forgetfulness, dizziness, and increasing headaches. (AR 324.) Dr. Mahdad also noted Plaintiff's complaints of neck and back pain, earaches, interrupted sleep, depression, and pain and swelling in his left knee.

Dr. Mahdad continued to treat Plaintiff at least through 2004. His opinion that Plaintiff remained temporarily totally disabled did not change during that time. Indeed, he opined on June 10, 2002, "It is very doubtful that the patient can compete in open labor market considering multisystem trauma and disabilities." (AR 749.) The ALJ completely ignored Dr. Mahdad's opinion in his decision, which, given the weight the ALJ is required to give a treating physician's opinion, was clear error.

Dr. Curtis also continued to treat Plaintiff at least through 2004. He concluded that Plaintiff likely suffered from permanent emotional impairment and appeared unlikely to "be able to engage in any suitable gainful employment within the foreseeable future." (AR 334.)

In rejecting Dr. Curtis' opinion, the ALJ stated that "Dr. Curtis' assessment appears to be overly restrictive in light of the less restrictive findings documented in Dr. McGee's report...." (AR 494.) The ALJ noted that Dr. McGee arrived at her opinion after physically examining Plaintiff and reviewing all the medical records, which

16

apparently convinced the ALJ to accord greater weight to Dr. McGee's report. However, it appears that the ALJ gave Dr. Curtis' opinion no weight at all, though the ALJ did not give any further explanation for rejecting the opinion. This treatment clearly conflicts with the requirement that the ALJ provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting a treating physician's opinion. For example, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Orn*, 495 F.3d at 632. A simple statement that Dr. Curtis' opinion is "overly restrictive" is insufficient.

The record reveals that Plaintiff's treating physicians believe him to be significantly impaired and unable to work. The ALJ relied on an examining physician's opinion and rejected or completely ignored the treating physicians' opinions, with little discussion or justification. Because the ALJ failed to provide specific and legitimate reasons for rejecting the treating physicians' opinions, the ALR's RFC determination is not supported by substantial evidence and must be rejected.

**B. The ALJ Did Not Provide Sufficient Reasons for Discrediting Plaintiff's Testimony.**

Plaintiff contends that the ALJ failed to provide a sufficient explanation for discounting Plaintiff's credibility as to his subjective symptoms. (Joint Stip. 20.) The Court agrees with Plaintiff and finds that the ALJ's credibility determination was insufficient.

Where an individual's claimed functional limitations and restrictions due to the alleged symptoms are reasonably consistent with objective medical and other evidence in the case, the ALJ must credit the claimant's allegations. SSR 96-7p, 1996 WL 374186, at * 2 (S.S.A.

July 2, 1996) (explaining 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). Though the ALJ need not believe the claimant's every allegation of pain, the ALJ must provide clear and convincing reasons for discrediting a claimant's complaints. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). The ALJ must "state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). Once the claimant has provided medical evidence of an underlying impairment that could reasonably be expected to cause some pain and absent evidence of malingering, the ALJ may not discount the severity of the claimant's symptoms solely because the medical records do not fully corroborate the claimant's complaints. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) (citations omitted).

In the present case, the ALJ found that Plaintiff suffered from post-concussion syndrome, chondromalacia of left knee, status post arthrotomy, chondroplasty, partial meniscectomy and synovectomy, chondromalacia right knee, low back pain, morbid obesity, hypertension (controlled), headaches, depression, post-traumatic stress disorder, and right carpal tunnel syndrome. (AR 498.) Symptoms of post-concussion syndrome include headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity,[12] all of which Plaintiff has complained at various times since his accident.

Because Plaintiff provided objective medical evidence showing the existence of impairments that could cause his symptoms, the ALJ may not

---

[12]  http://www.mayoclinic.com/health/post-concussion-syndrome/DS01020/DSECTION=2 (last accessed October 10, 2007).

reject Plaintiff's testimony regarding the severity of his symptoms without identifying which symptom testimony the ALJ finds to be incredible and providing clear and convincing reasons to support his conclusion. Factors an ALJ may properly consider in evaluating a claimant's credibility include the claimant's reputation for truthfulness, any inconsistencies between the claimant's testimony and conduct or within the testimony itself, the claimant's daily activities, an unexplained failure to seek treatment or to follow treatment, *Orn*, 495 F.3d at 636 (citing *Fair*, 885 F.2d at 603), and effectiveness or adverse side effects of pain medication. *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995).

The ALJ acknowledged that Plaintiff's credibility was a "material factor" in evaluating Plaintiff's claim, because his "allegations of disability due to pain [were] based primarily on subjective symptoms...." (AR 496.) After reviewing the evidence and considering Plaintiff's testimony, the ALJ concluded that Plaintiff was not fully credible with respect to "the extent, intensity, and duration of the alleged subjective pain and functional limitations and restrictions...." (*Id.*) The ALJ appears to have based his credibility determination on the following factors: (1) at the hearing, Plaintiff answered questions alertly and appropriately; (2) though Plaintiff regularly used strong medication for his pain, he did not experience significant side effects that would impair his ability to work; and (3) Plaintiff was able to perform a "wide variety" of daily activities. (AR 495-96.) In discrediting Plaintiff's claimed limitations for these reasons, the ALJ misapplied the law.

//

//

**1. Plaintiff's Appearance at the Hearing May Not Be the Sole Reason for an Adverse Credibility Determination.**

The ALJ may not discount Plaintiff's credibility solely because the ALJ did not perceive any manifestations of Plaintiff's pain or mental impairment at the hearing. *Fair*, 885 F.2d at 602 (citing *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984)). That Plaintiff answered questions "alertly and appropriately" and his thoughts "did not seem to wander," alone, does not constitute substantial evidence to support the ALJ's negative credibility finding.

Because the ALJ's other stated reasons for negating Plaintiff's credibility are insufficient, as discussed below, the ALJ cannot rest on Plaintiff's appearance at the hearing for the adverse credibility determination.

**2. The Absence of Side Effects Does Not Establish Plaintiff's Ability to Work.**

The ALJ's conclusion that Plaintiff suffered few serious side effects from his medications, though possibly an accurate observation, is beside the point. While Plaintiff daily ingests an impressive array of medication for his various impairments, he does not appear to be arguing that the medication prevents him from working. Instead, the underlying impairments themselves form the basis for Plaintiff's request for disability benefits.

Furthermore, whether the medications or the impairments caused Plaintiff's subjective complaints is irrelevant under these circumstances. The proper inquiry is whether Plaintiff's subjective complaints, whatever their cause, preclude him from working and render him disabled under the Social Security Act. The ALJ concluded that Plaintiff's medication did not interfere with his ability to work and

20

stopped there. He did not identify any conflicting testimony or other evidence that might bear on Plaintiff's credibility, nor did he clarify how the absence of side effects impacted his analysis in general. To the extent that the ALJ relied on this factor in making his credibility determination, the ALJ did not provide clear and convincing reasons why the absence of side effects would negate Plaintiff's credibility. Accordingly, this factor does not provide substantial evidence for the ALJ's credibility determination.

**3. Plaintiff's Daily Activities Do Not Preclude a Finding of Disability.**

An ALJ may consider a claimant's daily activities in making an adverse credibility determination in two situations: (1) where the claimant's alleged limitations contradict testimony or other evidence regarding the claimant's daily activities; or (2) where the claimant's daily activities are transferable to a work environment. *Orn*, 495 F.3d at 639.

In the present case, the ALJ concluded that Plaintiff's daily activities negated his credibility. (AR 495-96.) Specifically, the ALJ relied on a questionnaire that Plaintiff's father filled out as demonstrating Plaintiff's ability to perform a "wide variety" of activities: "[T]he claimant's father[] reported that the claimant spent a typical day going to therapy and doctors, exercising, riding a bike and watching television[]. He noted that the claimant was still having problems with his left hand and arm, eyes, ears, and had headaches. However, he also indicated that the claimant prepared and cooked most of his own meals, and did most of his own shopping. The claimant's father also reported that the claimant paid most of his own bills, washed his own clothes, and did his own ironing with a little help. He noted that

21

1   the claimant went outside the home just about everyday, and he only

2   required assistance for special needs. The claimant's father added that

3   the claimant was able to drive a car, use public transportation, and

4   read the newspaper, bible and magazines. He also reported that the

5   claimant collected baseball cards, went to church twice a week, and

6   watched movies twice a month." (AR 496.)

7        In concluding that Plaintiff was not fully credible as to his

8   functional limitations and restrictions, the ALJ explained, "Although

9   the claimant indicated that he was able to perform only very limited

10  daily activities, the great weight of the evidence showed that he was at

11  least capable of performing a wide variety of activities...." (AR 495.)

12  The ALJ then concluded that Plaintiff could perform limited medium work.

13  (*Id.*)

14       First, the ALJ does not provide specific examples to illustrate

15  what testimony or evidence Plaintiff's daily activities contradict,

16  beyond stating that Plaintiff claimed he could only perform "very

17  limited" daily activities, as quoted above. However, the record contains

18  no evidence that Plaintiff ever claimed to be further incapacitated than

19  his daily activities would indicate.[13] Furthermore, the ALJ did not

20  provide clear and convincing evidence of any such contradictions, as the

21  law requires. *See Orn*, 495 F.3d at 639 (citation omitted). In addition,

22  the ALJ gave greater weight to the questionnaire based on the fact that

23  Plaintiff's own statements actually supported his father's

24

25  _____

    [13]   The record does not contain the transcript from Plaintiff's
    second hearing, and the transcript from the third hearing is incomplete,
26  omitting any testimony Plaintiff may have given. While it is possible
    that Plaintiff could have claimed to be completely incapacitated at the
27  hearing, that record is not before the Court, and the ALJ did not
    identify any such statements in his decision. The Court will assume that
28  if Plaintiff had made any such representations during the hearing, the
    ALJ would have said so.

characterization of his daily activities: "[T]his statement is consistent with the claimant's responses in a Daily Activities Questionnaire dated June 10, 1999[], in which the claimant reported that he was capable of performing essentially the same activities indicated by his father." (AR 496.) Accordingly, is seems clear that the ALJ did not rely on any contradictions in Plaintiff's testimony to discount his credibility.

Second, although daily activities are certainly relevant in assessing a claimant's credibility with respect to the alleged severity of subjective symptoms, the law does not require a claimant to be "utterly incapacitated to be eligible for benefits." *Fair*, 885 F.2d at 603 (citations omitted); *Orn*, 495 F.3d at 639 ("'This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her overall disability.'")(citing *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)). A claimant may be perfectly capable of washing his or her own dishes or occasionally driving a car, but still may be disabled under the Social Security Act.

In order to rely on a claimant's daily activities as evidencing his or her ability to work, the ALJ must not only identify those activities, as did the ALJ in the present case, but must also explain how those activities translate to a working environment. *Id.* As the Ninth Circuit noted in *Fair*, "[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id.* If an ALJ determines that a claimant's daily activities "*are* transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Id.* (emphasis in

23

1  original).

2  Here, the ALJ listed Plaintiff's daily activities, stated that
3  Plaintiff was able to perform a "wide variety" of tasks, and concluded
4  that he was capable of working. The ALJ's decision included no
5  assessment of how Plaintiff's ability to iron his clothes "with a little
6  help" or paying his own bills could be applied to a working environment,
7  particularly as a security guard. As the Ninth Circuit has already
8  determined, such positions "require[] sustained concentration and
9  attention, as well as the ability to act immediately in emergencies."
10 *Orn*, 495 F.3d at 639. The ALJ failed to explain how collecting baseball
11 cards or occasional grocery shopping transfers to such a position.
12 Accordingly, the ALJ's adverse credibility determination based on
13 Plaintiff's daily activities is not supported by substantial evidence.

14 Although weighing a claimant's credibility is an integral part of
15 the disability determination, the ALJ must provide sufficient
16 justification for discounting a claimant's credibility. The ALJ has not
17 done so here.

18 **C. Remand for Benefits**

19 Upon determining that the ALJ erred in the benefits denial, the
20 Court may remand the case for further proceedings or award benefits. An
21 award of benefits is appropriate where "'it is clear from the
22 administrative record that the ALJ would be required to award benefits
23 if the claimant's ... testimony were credited [as true].'" *Lingenfelter*
24 *v. Astrue*, 2007 WL 2874403 *10 (9th Cir. 2007)(quoting *Varney v. Sec'y*
25 *of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1998)).

26 In the present case, Plaintiff has already had three hearings
27 before three different ALJs. He was injured nine years ago, and he has
28 been pursuing his benefits claim since 1999. The vocational experts

24

whose testimony are in the record both indicated that, Plaintiff would be unable to find work if his symptom testimony were credited. Accordingly, the Court is crediting Plaintiff's testimony regarding the extent of his limitations, as well as the opinions of his treating physicians, and finds that an award of benefits is appropriate at this time.

**IV. Conclusion**

For the reasons stated above, it is **ORDERED** that the case be remanded for an award of benefits. The Commissioner's request for an order affirming the Commissioner's final decision and dismissing the action is **DENIED**.

DATED: October 16, 2007

_____
MARC L. GOLDMAN
United States Magistrate Judge